## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>B.S.A. S.A.,<br><br>LAG HOLDING, INC.,<br><br>and<br><br>THE KRAFT HEINZ COMPANY,<br><br>*Defendants*. | Case No.: 1:21-cv-02976-RBW |

## FINAL JUDGMENT

WHEREAS, Plaintiff, United States of America, filed its Complaint on November 10, 2021;

AND WHEREAS, the United States and Defendants, B.S.A. S.A., LAG Holding, Inc., and The Kraft Heinz Company, have consented to entry of this Final Judgment without the taking of testimony, without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party relating to any issue of fact or law;

AND WHEREAS, Defendants agree to make certain divestitures to remedy the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants represent that the divestitures and other relief required by this Final Judgment can and will be made and that Defendants will not later raise a claim of

hardship or difficulty as grounds for asking the Court to modify any provision of this Final Judgment;

NOW THEREFORE, it is ORDERED, ADJUDGED, AND DECREED:

## I.   JURISDICTION

The Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act (15 U.S.C. § 18).

## II.   DEFINITIONS

As used in this Final Judgment:

A.   "Acquirer" or "Acquirers" means the entity or entities approved by the United States in its sole discretion to which Defendants divest any of the Divestiture Assets.

B.   "Acquirer of the Athenos Divestiture Assets" means Emmi Roth or another entity approved by the United States in its sole discretion to which Defendants divest the Athenos Divestiture Assets.

C.   "Acquirer of the Polly-O Divestiture Assets" means BelGioioso or another entity approved by the United States in its sole discretion to which Defendants divest the Polly-O Divestiture Assets.

D.   "Athenos Brand Name" means Athenos and any other name that uses, incorporates, or references the Athenos name.

E.   "Athenos Divestiture Assets" means all of Defendants' rights, titles, and interests in and to all property and assets, tangible and intangible, wherever located, relating to or used in connection with the Athenos Divestiture Business, including:

1.      the Athenos Brand Name, including (a) the right to the exclusive use of the Athenos Brand Name in all sales channels (including the retail, foodservice, and ingredients or industrial channels), and (b) all other intellectual property owned, licensed, or sublicensed, either as licensor or licensee, including (i) patents, patent applications, and inventions and discoveries that may be patentable, (ii) registered and unregistered copyrights and copyright applications, and (iii) registered and unregistered trademarks, trade dress, service marks, trade names, and trademark applications;

2.      all contracts, contractual rights, and customer relationships, and all other agreements, commitments, and understandings, including agreements with suppliers, manufacturers, co-packers, and retailers, teaming agreements, leases, and all outstanding offers or solicitations to enter into a similar arrangement;

3.      all licenses, permits, certifications, approvals, consents, registrations, waivers, and authorizations, including those issued or granted by any governmental organization, and all pending applications or renewals;

4.      all records and data, including (a) customer lists, accounts, sales, and credits records, (b) production, repair, maintenance, and performance records, (c) manuals and technical information Defendants provide to their own employees, customers, suppliers, agents, or licensees, (d) records and research data concerning historic and current research and development activities, including designs of experiments and the results of successful and unsuccessful designs and experiments, and (e) drawings, blueprints, and designs; and

5.      all other intangible property, including (a) commercial names and d/b/a names, (b) technical information, including recipes and formulas, (c) computer software and related documentation, know-how, trade secrets, design protocols, specifications for materials,

specifications for parts, specifications for devices, safety procedures (e.g., for the handling of materials and substances), quality assurance and control procedures, (d) design tools and simulation capabilities, and (e) rights in internet web sites and internet domain names.

*Provided, however*, that the assets specified in Paragraphs II.E.1–5 above do not include the Athenos Transitional Manufacturing Assets or the Athenos Transitional Services Contracts.

F.    "Athenos Divestiture Business" means the worldwide business of the sale of Athenos Products by Kraft Heinz.

G.    "Athenos Personnel" means all full-time, part-time, or contract employees of Kraft Heinz, wherever located, whose job responsibilities relate in any way to the Athenos Divestiture Assets, at any time between September 15, 2020, and the date on which the Athenos Divestiture Assets are divested. The United States, in its sole discretion, will resolve any disagreement relating to which employees are Athenos Personnel.

H.    "Athenos Products" means any product that Kraft Heinz sold, sells, or has plans to sell under the Athenos Brand Name anywhere in the world.

I.    "Athenos Transitional Manufacturing Assets" means:

1.    production lines numbers 25 and 26, which are used by the Athenos Divestiture Business for crumbling and packaging feta and are located at Kraft Heinz's facility at 1007 Townline Road, Wausau, Wisconsin 54403;

2.    the feta packaging mold used to produce plastic feta lids and containers, which was purchased by Kraft Heinz in 2021 and is located at the facilities of RPC Bramlage-WIKO USA, Inc. in Morgantown, Pennsylvania; and

3.    the contracts and agreements between Kraft Heinz and each of the following: (a) Agropur, dated January 13, 2021; (b) J. Rettenmaier USA LP, dated January 1,

5

2021; (c) International Paper Company, dated January 1, 2016, and last amended December 31, 2020; (d) Berry Global, Inc., dated April 1, 2014, supplemented September 22, 2014, and last amended August 1, 2019; (e) Weber Packaging Solutions, Inc., dated January 1, 2020; and (f) Bramlage, Inc. d/b/a RPC Bramlage Morgantown (the "RPC Agreement"), dated October 23, 2017.

J.      "Athenos Transitional Services Contracts" means the contracts and agreements between Kraft Heinz and each of the following: (a) Prairie Farms, dated November 3, 2020; (b) Great Lakes Cheese Company, Inc., dated January 1, 2021, and supplemented and amended on January 1, 2021; (c) Marathon Cheese Corporation, dated April 10, 2021, and supplemented on April 10, 2021; (d) Cedar's Mediterranean Foods, Inc., dated November 1, 2020, and supplemented on February 1, 2021; and (e) Saputo Cheese USA, Inc., dated November 1, 2020.

K.      "BelGioioso" means BelGioioso Cheese, Inc., a Wisconsin corporation with its headquarters in Green Bay, Wisconsin, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

L.      "Divestiture Assets" means the Athenos Divestiture Assets and the Polly-O Divestiture Assets.

M.      "Emmi Roth" means Emmi Roth USA, Inc., a Wisconsin corporation with its headquarters in Fitchburg, Wisconsin, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

N.      "Including" means including, but not limited to.

6

O.     "Kraft Heinz" means Defendant The Kraft Heinz Company, a Delaware corporation with its co-headquarters in Pittsburgh, Pennsylvania and Chicago, Illinois, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

P.     "Lactalis" means Defendant B.S.A. S.A., a French corporation with its headquarters in Laval, France, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

Q.     "LAG Holding" means Defendant LAG Holding, Inc., a wholly-owned subsidiary of Lactalis and a Delaware corporation with its headquarters in Buffalo, New York, its successors and assigns, and its subsidiaries, including Lactalis American Group, Inc., divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

R.     "Polly-O Brand Name" means Polly-O and any other name that uses, incorporates, or references the Polly-O name.

S.     "Polly-O Divestiture Assets" means all of Defendants' rights, titles, and interests in and to all property and assets, tangible and intangible, wherever located, relating to or used in connection with the Polly-O Divestiture Business, including:

1.     the Polly-O Brand Name, including (a) the right to the exclusive use of the Polly-O Brand Name in all sales channels (including the retail, foodservice, and ingredients or industrial channels), and (b) all other intellectual property owned, licensed, or sublicensed, either as licensor or licensee, including (i) patents, patent applications, and inventions and discoveries that may be patentable, (ii) registered and unregistered copyrights and copyright applications,

7

and (iii) registered and unregistered trademarks, trade dress, service marks, trade names, and trademark applications;

   2.  the Shared Recipes License;

   3.  all contracts, contractual rights, and customer relationships, and all other agreements, commitments, and understandings, including agreements with suppliers, manufacturers, co-packers, and retailers, teaming agreements, leases, and all outstanding offers or solicitations to enter into a similar arrangement;

   4.  all licenses, permits, certifications, approvals, consents, registrations, waivers, and authorizations, including those issued or granted by any governmental organization, and all pending applications or renewals;

   5.  all records and data, including (a) customer lists, accounts, sales, and credits records, (b) production, repair, maintenance, and performance records, (c) manuals and technical information Defendants provide to their own employees, customers, suppliers, agents, or licensees, (d) records and research data concerning historic and current research and development activities, including designs of experiments and the results of successful and unsuccessful designs and experiments, and (e) drawings, blueprints, and designs; and

   6.  all other intangible property, including (a) commercial names and d/b/a names, (b) technical information, (c) computer software and related documentation, know-how, trade secrets, design protocols, specifications for materials, specifications for parts, specifications for devices, safety procedures (e.g., for the handling of materials and substances), quality assurance and control procedures, (d) design tools and simulation capabilities, and (e) rights in internet web sites and internet domain names.

*Provided, however,* that the assets specified in Paragraphs II.S.1–6 above do not include any ownership of the intellectual property licensed through the Shared Recipes License or the Polly-O Excluded Contracts.

  T.  "Polly-O Divestiture Business" means the worldwide business of the sale of Polly-O Products by Kraft Heinz.

  U.  "Polly-O Excluded Contracts" means the contracts and agreements between Kraft Heinz and each of the following: (a) Foremost Farms USA Cooperative, dated October 8, 2020; (b) Marathon Cheese Corporation, dated April 10, 2021, and supplemented on April 10, 2021; (c) Saputo Cheese USA Inc., dated November 1, 2020; (d) Amcor Flexibles North America, Inc. (fka Bemis Company, Inc.), dated January 1, 2015, entered into initially between H.J. Heinz Supply Chain Europe B.V. and Bemis Company, Inc., and last amended November 1, 2020; (e) International Paper Company, dated January 1, 2016, and last amended December 31, 2020; (f) Berry Global, Inc., dated April 1, 2014, supplemented September 22, 2014, and last amended August 1, 2019; (g) Transcontinental US LLC, dated January 1, 2019; and (h) J. Rettenmaier USA LP, dated January 1, 2021.

  V.  "Polly-O Personnel" means all full-time, part-time, or contract employees of Kraft Heinz, wherever located, whose job responsibilities relate in any way to the Polly-O Divestiture Assets, at any time between September 15, 2020, and the date on which the Polly-O Divestiture Assets are divested. The United States, in its sole discretion, will resolve any disagreement relating to which employees are Polly-O Personnel.

  W.  "Polly-O Products" means any product that Kraft Heinz sold, sells, or has plans to sell under the Polly-O Brand Name anywhere in the world.

X.     "Shared Recipes License" means a perpetual, royalty-free, paid-up, irrevocable, worldwide, non-exclusive license to the formulas, recipes and related trade secrets, know-how, confidential business information and related data that, on or prior to the date of the signing of the Asset Preservation and Hold Separate Stipulation and Order by Defendants, were used by Kraft Heinz for the production of cheese sold under both (i) the Polly-O Brand Name and (ii) any name other than the Polly-O Brand Name.

Y.     "Transaction" means the definitive agreement that Lactalis and Kraft Heinz entered into on September 15, 2020, for the acquisition by Lactalis of, among other assets, Kraft Heinz's natural, grated, cultured, and specialty cheese businesses in the United States.

## III.    APPLICABILITY

A.     This Final Judgment applies to Lactalis, LAG Holding, and Kraft Heinz, as defined above, and all other persons in active concert or participation with any Defendant who receive actual notice of this Final Judgment.

B.     If, prior to complying with Section IV, Section V, and Section VI of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of business units that include any of the Divestiture Assets, Defendants must require any purchaser to be bound by the provisions of this Final Judgment. Defendants need not obtain such an agreement from Acquirers.

## IV.    DIVESTITURE OF THE ATHENOS DIVESTITURE ASSETS

A.     Defendants are ordered and directed, within 30 calendar days after the Court's entry of the Asset Preservation and Hold Separate Stipulation and Order in this matter, to divest the Athenos Divestiture Assets in a manner consistent with this Final Judgment to Emmi Roth or another Acquirer acceptable to the United States, in its sole discretion. The United States, in its

10

sole discretion, may agree to one or more extensions of this time period not to exceed 60 calendar days in total and will notify the Court of any extensions.

B.     Defendants must use best efforts to divest the Athenos Divestiture Assets as expeditiously as possible. Defendants must take no action that would jeopardize the completion of the divestiture ordered by the Court, including any action to impede the permitting, operation, or divestiture of the Athenos Divestiture Assets.

C.     Unless the United States otherwise consents in writing, divestiture pursuant to this Final Judgment must include the entire Athenos Divestiture Assets and must be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Athenos Divestiture Assets can and will be used by Acquirer of the Athenos Divestiture Assets as part of a viable, ongoing business of selling feta cheese to retailers and that the divestiture to Acquirer of the Athenos Divestiture Assets will remedy the competitive harm in the market for selling feta cheese to retailers alleged in the Complaint.

D.     The divestiture of the Athenos Divestiture Assets must be made to an Acquirer that, in the United States' sole judgment, has the intent and capability, including the necessary managerial, operational, technical, and financial capability, to compete effectively in the sale of feta cheese to retailers.

E.     The divestiture of the Athenos Divestiture Assets must be accomplished in a manner that satisfies the United States, in its sole discretion, that none of the terms of any agreement between Acquirer of the Athenos Divestiture Assets and Defendants gives Defendants the ability unreasonably to raise costs for Acquirer of the Athenos Divestiture Assets, to lower the efficiency of Acquirer of the Athenos Divestiture Assets, or otherwise interfere in the ability

of Acquirer of the Athenos Divestiture Assets to compete effectively in the sale of feta cheese to retailers.

      F.      In the event Defendants are attempting to divest the Athenos Divestiture Assets to an Acquirer other than Emmi Roth, Defendants promptly must make known, by usual and customary means, the availability of the Athenos Divestiture Assets. Defendants must inform any person making an inquiry relating to a possible purchase of the Athenos Divestiture Assets that the Athenos Divestiture Assets are being divested in accordance with this Final Judgment and must provide that person with a copy of this Final Judgment. Defendants must offer to furnish to all prospective Acquirers of the Athenos Divestiture Assets, subject to customary confidentiality assurances, all information and documents relating to the Athenos Divestiture Assets that are customarily provided in a due diligence process; *provided, however,* that Defendants need not provide information or documents subject to the attorney-client privilege or work-product doctrine. Defendants must make all information and documents available to the United States at the same time that the information and documents are made available to any other person.

      G.      Defendants must provide prospective Acquirers of the Athenos Divestiture Assets with (1) access to make inspections of the Athenos Divestiture Assets; (2) access to all environmental, zoning, and other permitting documents and information relating to the Athenos Divestiture Assets; and (3) access to all financial, operational, or other documents and information relating to the Athenos Divestiture Assets that would customarily be provided as part of a due diligence process. Defendants also must disclose all encumbrances on any part of the Athenos Divestiture Assets, including on intangible property.

H.      Defendants must cooperate with and assist Acquirer of the Athenos Divestiture Assets in identifying and, at the option of Acquirer of the Athenos Divestiture Assets, in hiring all Athenos Personnel, including:

1.      Within 10 business days following the filing of the Complaint in this matter, Defendants must identify all Athenos Personnel to Acquirer of the Athenos Divestiture Assets and the United States, including by providing organization charts covering all Athenos Personnel.

2.      Within 10 business days following receipt of a request by Acquirer of the Athenos Divestiture Assets or the United States, Defendants must provide to Acquirer of the Athenos Divestiture Assets and the United States additional information relating to Athenos Personnel, including name, job title, reporting relationships, past experience, responsibilities, training and educational histories, relevant certifications, and job performance evaluations. Defendants must also provide to Acquirer of the Athenos Divestiture Assets and the United States information relating to current and accrued compensation and benefits of Athenos Personnel, including most recent bonuses paid, aggregate annual compensation, current target or guaranteed bonus, if any, any retention agreement or incentives, and any other payments due, compensation or benefits accrued, or promises made to the Athenos Personnel. If Defendants are barred by any applicable law from providing any of this information, Defendants must provide, within 10 business days following receipt of the request, the requested information to the full extent permitted by law and also must provide a written explanation of Defendants' inability to provide the remaining information, including specifically identifying the provisions of the applicable laws.

13

3. At the request of Acquirer of the Athenos Divestiture Assets, Defendants must promptly make Athenos Personnel available for private interviews with Acquirer of the Athenos Divestiture Assets during normal business hours at a mutually agreeable location.

4. Defendants must not interfere with any effort by Acquirer of the Athenos Divestiture Assets to employ any Athenos Personnel. Interference includes offering to increase the compensation or improve the benefits of Athenos Personnel unless (a) the offer is part of a company-wide increase in compensation or improvement in benefits that was announced prior to September 15, 2020, or (b) the offer is approved by the United States in its sole discretion. Defendants' obligations under this Paragraph will expire six months after the date on which the Athenos Divestiture Assets are divested.

5. For Athenos Personnel who elect employment with Acquirer of the Athenos Divestiture Assets either (a) before the date on which a transition services contract entered into pursuant to Paragraph IV.P is terminated or expires, or (b) within three months after the date on which such a contract is terminated or expires, Defendants must waive all non-compete and non-disclosure agreements; vest and pay to the Athenos Personnel (or to Acquirer of the Athenos Divestiture Assets for payment to the employee) on a prorated basis any bonuses, incentives, other salary, benefits, or other compensation fully or partially accrued at the time of the transfer of the employee to Acquirer of the Athenos Divestiture Assets; vest any unvested pension and other equity rights; and provide all other benefits that those Athenos Personnel otherwise would have been provided had the Athenos Personnel continued employment with Defendants, including any retention bonuses or payments. Defendants may maintain reasonable restrictions on disclosure by Athenos Personnel of Defendants' proprietary non-public

14

information that is unrelated to the Athenos Divestiture Assets and not otherwise required to be disclosed by this Final Judgment.

6.      For a period of 12 months from the date on which the Athenos Divestiture Assets are divested, Defendants may not solicit to rehire Athenos Personnel who were hired by Acquirer of the Athenos Divestiture Assets either (a) before the date on which a transition services contract entered into pursuant to Paragraph IV.P is terminated or expires, or (b) within three months after the date on which such a contract is terminated or expires, unless an individual is terminated or laid off by Acquirer of the Athenos Divestiture Assets or Acquirer of the Athenos Divestiture Assets agrees in writing that Defendants may solicit to re-hire that individual.   Nothing in this Paragraph prohibits Defendants from advertising employment openings using general solicitations or advertisements and re-hiring Athenos Personnel who apply for an employment opening through a general solicitation or advertisement.

I.      Defendants must warrant to Acquirer of the Athenos Divestiture Assets that (1) the Athenos Divestiture Assets will be operational and without material defect on the date of their transfer to Acquirer of the Athenos Divestiture Assets; (2) there are no material defects in the environmental, zoning, or other permits relating to the operation of the Athenos Divestiture Assets; and (3) Defendants have disclosed all encumbrances on any part of the Athenos Divestiture Assets, including on intangible property.   Following the sale of the Athenos Divestiture Assets, Defendants must not undertake, directly or indirectly, challenges to the environmental, zoning, or other permits relating to the operation of the Athenos Divestiture Assets.

J.      Defendants must assign, subcontract, or otherwise transfer all contracts, agreements, and customer relationships (or portions of such contracts, agreements, and customer

15

relationships) included in the Athenos Divestiture Assets, including all supply and sales contracts and co-packing and packaging supplier agreements, to Acquirer of the Athenos Divestiture Assets; *provided, however,* that for any contract or agreement that requires the consent of another party to assign, subcontract, or otherwise transfer, Defendants must use best efforts to accomplish the assignment, subcontracting, or transfer. Defendants must not interfere with any negotiations between Acquirer of the Athenos Divestiture Assets and a contracting party.

K.    Defendants must, at the option of the Acquirer of the Athenos Divestiture Assets, and subject to the approval by the United States in its sole discretion, assign, subcontract, or otherwise transfer any of the Athenos Transitional Services Contracts to Acquirer of the Athenos Divestiture Assets upon request of the Acquirer of the Athenos Divestiture Assets either at the time of the divestiture of the Athenos Divestiture Assets or at any time prior to the expiration or termination of a transition services contract entered into pursuant to Paragraph IV.P; *provided, however,* that for any contract or agreement that requires the consent of another party to assign, subcontract, or otherwise transfer, Defendants must use best efforts to accomplish the assignment, subcontracting, or transfer. Defendants must not interfere with any negotiations between Acquirer of the Athenos Divestiture Assets and a contracting party.

L.    Defendants must use best efforts to assist Acquirer of the Athenos Divestiture Assets to obtain all necessary licenses, registrations, and permits to operate the Athenos Divestiture Business. Until Acquirer of the Athenos Divestiture Assets obtains the necessary licenses, registrations, and permits, Defendants must provide Acquirer of the Athenos Divestiture Assets with the benefit of Defendants' licenses, registrations, and permits to the full extent permissible by law.

M.      At the option of Acquirer of the Athenos Divestiture Assets, and subject to approval by the United States in its sole discretion, on or before the date on which the Athenos Divestiture Assets are divested, Defendants must enter into a supply contract or contracts for the processing and packaging of Athenos Products sufficient to meet the needs of Acquirer of the Athenos Divestiture Assets, as determined by Acquirer of the Athenos Divestiture Assets, for a period of up to two years, on terms and conditions reasonably related to market conditions for the processing and packaging of Athenos Products. Any amendment to or modification of any provision of any such supply contract is subject to approval by the United States, in its sole discretion. The United States, in its sole discretion, may approve one or more extensions of any supply contract, for a total of up to an additional 12 months. If Acquirer of the Athenos Divestiture Assets seeks an extension of the term of any supply contract, Defendants must notify the United States in writing at least three months prior to the date the supply contract expires. Acquirer of the Athenos Divestiture Assets may terminate a supply contract, or any portion of a supply contract, without cost or penalty at any time upon commercially reasonable written notice. The employees of Defendants tasked with providing services pursuant to a supply contract must not share any competitively sensitive information of Acquirer of the Athenos Divestiture Assets with any other employee of Defendants.

N.      At the option of Acquirer of the Athenos Divestiture Assets, and subject to approval by the United States in its sole discretion, Defendants may, for the sole purpose of fulfilling any supply contract required by Paragraph IV.M of this Final Judgment, retain the Athenos Transitional Manufacturing Assets until the earlier of (1) 60 calendar days after Acquirer of the Athenos Divestiture Assets terminates the supply contract or contracts required by Paragraph IV.M of this Final Judgment or (2) 60 calendar days following the expiration of

17

any supply contract or contracts required by Paragraph IV.M of this Final Judgment, after which Defendants must sell and transfer to Acquirer of the Athenos Divestiture Assets the Athenos Transitional Manufacturing Assets on terms and conditions reasonably related to market conditions for such manufacturing assets.

O.      Defendants must warrant to Acquirer of the Athenos Divestiture Assets that (1) the Athenos Transitional Manufacturing Assets will be operational and without material defect on the date of their transfer to Acquirer of the Athenos Divestiture Assets; (2) there are no material defects in the environmental, zoning, or other permits relating to the operation of the Athenos Transitional Manufacturing Assets; and (3) Defendants have disclosed all encumbrances on any part of the Athenos Transitional Manufacturing Assets, including on intangible property. Following the sale of the Athenos Transitional Manufacturing Assets, Defendants must not undertake, directly or indirectly, challenges to the environmental, zoning, or other permits relating to the operation of the Athenos Transitional Manufacturing Assets.

P.      At the option of Acquirer of the Athenos Divestiture Assets, and subject to approval by the United States in its sole discretion, on or before the date on which the Athenos Divestiture Assets are divested, Defendants must enter into a contract to provide transition services for back office, human resources, accounting, information technology services and support, facilitating repacking, warehousing, transportation, and by making personnel available to assist Acquirer of the Athenos Divestiture Assets for a period of up to six months on terms and conditions reasonably related to market conditions for the provision of the transition services. Any amendment to or modification of any provision of a contract to provide transition services is subject to approval by the United States, in its sole discretion. The United States, in its sole discretion, may approve one or more extensions of any contract for transition services, for a total

18

of up to an additional six months.  If Acquirer of the Athenos Divestiture Assets seeks an extension of the term of any contract for transition services, Defendants must notify the United States in writing at least 30 days prior to the date the contract expires.  Acquirer of the Athenos Divestiture Assets may terminate a contract for transition services, or any portion of a contract for transition services, without cost or penalty at any time upon commercially reasonable written notice.  The employees of Defendants tasked with providing transition services must not share any competitively sensitive information of Acquirer of the Athenos Divestiture Assets with any other employee of Defendants.

Q.      If any term of an agreement between Defendants and Acquirer of the Athenos Divestiture Assets, including an agreement to effectuate the divestiture of the Athenos Divestiture Assets required by this Final Judgment, varies from a term of this Final Judgment, to the extent that Defendants cannot fully comply with both, this Final Judgment determines Defendants' obligations.

## V.      DIVESTITURE OF THE POLLY-O DIVESTITURE ASSETS

A.      Defendants are ordered and directed, within 30 calendar days after the Court's entry of the Asset Preservation and Hold Separate Stipulation and Order in this matter, to divest the Polly-O Divestiture Assets in a manner consistent with this Final Judgment to BelGioioso or another Acquirer acceptable to the United States, in its sole discretion.  The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed 60 calendar days in total and will notify the Court of any extensions.

B.      Defendants must use best efforts to divest the Polly-O Divestiture Assets as expeditiously as possible.  Defendants must take no action that would jeopardize the completion

of the divestiture ordered by the Court, including any action to impede the permitting, operation, or divestiture of the Polly-O Divestiture Assets.

C.     Unless the United States otherwise consents in writing, divestiture pursuant to this Final Judgment must include the entire Polly-O Divestiture Assets and must be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Polly-O Divestiture Assets can and will be used by Acquirer of the Polly-O Divestiture Assets as part of a viable, ongoing business of selling ricotta cheese to retailers, and that the divestiture to Acquirer of the Polly-O Divestiture Assets will remedy the competitive harm in the market for selling ricotta cheese to retailers alleged in the Complaint.

D.     The divestiture of the Polly-O Divestiture Assets must be made to an Acquirer that, in the United States' sole judgment, has the intent and capability, including the necessary managerial, operational, technical, and financial capability, to compete effectively in the sale of ricotta cheese to retailers.

E.     The divestiture of the Polly-O Divestiture Assets must be accomplished in a manner that satisfies the United States, in its sole discretion, that none of the terms of any agreement between Acquirer of the Polly-O Divestiture Assets and Defendants gives Defendants the ability unreasonably to raise costs for Acquirer of the Polly-O Divestiture Assets, to lower the efficiency of Acquirer of the Polly-O Divestiture Assets, or otherwise interfere in the ability of Acquirer of the Polly-O Divestiture Assets to compete effectively in the sale of ricotta cheese to retailers.

F.     In the event Defendants are attempting to divest the Polly-O Divestiture Assets to an Acquirer other than BelGioioso, Defendants promptly must make known, by usual and customary means, the availability of the Polly-O Divestiture Assets. Defendants must inform

any person making an inquiry relating to a possible purchase of the Polly-O Divestiture Assets that the Polly-O Divestiture Assets are being divested in accordance with this Final Judgment and must provide that person with a copy of this Final Judgment. Defendants must offer to furnish to all prospective Acquirers of the Polly-O Divestiture Assets, subject to customary confidentiality assurances, all information and documents relating to the Polly-O Divestiture Assets that are customarily provided in a due diligence process; *provided, however,* that Defendants need not provide information or documents subject to the attorney-client privilege or work-product doctrine. Defendants must make all information and documents available to the United States at the same time that the information and documents are made available to any other person.

G.    Defendants must provide prospective Acquirers of the Polly-O Divestiture Assets with (1) access to make inspections of the Polly-O Divestiture Assets; (2) access to all environmental, zoning, and other permitting documents and information relating to the Polly-O Divestiture Assets; and (3) access to all financial, operational, or other documents and information relating to the Polly-O Divestiture Assets that would customarily be provided as part of a due diligence process. Defendants also must disclose all encumbrances on any part of the Polly-O Divestiture Assets, including on intangible property.

H.    Defendants must cooperate with and assist Acquirer of the Polly-O Divestiture Assets in identifying and, at the option of Acquirer of the Polly-O Divestiture Assets, in hiring all Polly-O Personnel, including:

1.    Within 10 business days following the filing of the Complaint in this

matter, Defendants must identify all Polly-O Personnel to Acquirer of the Polly-O Divestiture Assets and the United States, including by providing organization charts covering all Polly-O Personnel.

2.        Within 10 business days following receipt of a request by Acquirer of the Polly-O Divestiture Assets or the United States, Defendants must provide to Acquirer of the Polly-O Divestiture Assets and the United States additional information relating to Polly-O Personnel, including name, job title, reporting relationships, past experience, responsibilities, training and educational histories, relevant certifications, and job performance evaluations. Defendants must also provide to Acquirer of the Polly-O Divestiture Assets and the United States information relating to current and accrued compensation and benefits of Polly-O Personnel, including most recent bonuses paid, aggregate annual compensation, current target or guaranteed bonus, if any, any retention agreement or incentives, and any other payments due, compensation or benefits accrued, or promises made to the Polly-O Personnel. If Defendants are barred by any applicable law from providing any of this information, Defendants must provide, within 10 business days following receipt of the request, the requested information to the full extent permitted by law and also must provide a written explanation of Defendants' inability to provide the remaining information, including specifically identifying the provisions of the applicable laws.

3.        At the request of Acquirer of the Polly-O Divestiture Assets, Defendants must promptly make Polly-O Personnel available for private interviews with Acquirer of the Polly-O Divestiture Assets during normal business hours at a mutually agreeable location.

4.        Defendants must not interfere with any effort by Acquirer of the Polly-O Divestiture Assets to employ any Polly-O Personnel. Interference includes offering to increase

the compensation or improve the benefits of Polly-O Personnel unless (a) the offer is part of a company-wide increase in compensation or improvement in benefits that was announced prior to September 15, 2020, or (b) the offer is approved by the United States in its sole discretion. Defendants' obligations under this Paragraph will expire six months after the date on which the Polly-O Divestiture Assets are divested.

5.      For Polly-O Personnel who elect employment with Acquirer of the Polly-O Divestiture Assets either (a) before the date on which a transition services contract entered into pursuant to Paragraph V.N is terminated or expires, or (b) within three months after the date on which such a contract is terminated or expires, Defendants must waive all non-compete and non-disclosure agreements; vest and pay to the Polly-O Personnel (or to Acquirer of the Polly-O Divestiture Assets for payment to the employee) on a prorated basis any bonuses, incentives, other salary, benefits, or other compensation fully or partially accrued at the time of the transfer of the employee to Acquirer of the Polly-O Divestiture Assets; vest any unvested pension and other equity rights; and provide all other benefits that those Polly-O Personnel otherwise would have been provided had the Polly-O Personnel continued employment with Defendants, including any retention bonuses or payments. Defendants may maintain reasonable restrictions on disclosure by Polly-O Personnel of Defendants' proprietary non-public information that is unrelated to the Polly-O Divestiture Assets and not otherwise required to be disclosed by this Final Judgment.

6.      For a period of 12 months from the date on which the Polly-O Divestiture Assets are divested, Defendants may not solicit to rehire Polly-O Personnel who were hired by Acquirer of the Polly-O Divestiture Assets either (a) before the date on which a transition services contract entered into pursuant to Paragraph V.N is terminated or expires, or (b) within

three months after the date on which such a contract is terminated or expires, unless an individual is terminated or laid off by Acquirer of the Polly-O Divestiture Assets or Acquirer of the Polly-O Divestiture Assets agrees in writing that Defendants may solicit to re-hire that individual. Nothing in this Paragraph prohibits Defendants from advertising employment openings using general solicitations or advertisements and re-hiring Polly-O Personnel who apply for an employment opening through a general solicitation or advertisement.

       I.      Defendants must warrant to Acquirer of the Polly-O Divestiture Assets that (1) the Polly-O Divestiture Assets will be operational and without material defect on the date of their transfer to Acquirer of the Polly-O Divestiture Assets; (2) there are no material defects in the environmental, zoning, or other permits relating to the operation of the Polly-O Divestiture Assets; and (3) Defendants have disclosed all encumbrances on any part of the Polly-O Divestiture Assets, including on intangible property. Following the sale of the Polly-O Divestiture Assets, Defendants must not undertake, directly or indirectly, challenges to the environmental, zoning, or other permits relating to the operation of the Polly-O Divestiture Assets.

       J.      Defendants must assign, subcontract, or otherwise transfer all contracts, agreements, and customer relationships (or portions of such contracts, agreements, and customer relationships) included in the Polly-O Divestiture Assets, including all supply and sales contracts and co-packing and packaging supply agreements, to Acquirer of the Polly-O Divestiture Assets; *provided, however,* that for any contract or agreement that requires the consent of another party to assign, subcontract, or otherwise transfer, Defendants must use best efforts to accomplish the assignment, subcontracting, or transfer. Defendants must not interfere with any negotiations between Acquirer of the Polly-O Divestiture Assets and a contracting party.

K.      In the event Defendants are attempting to divest the Polly-O Divestiture Assets to an Acquirer other than BelGioioso, Defendants must, as the option of Acquirer of the Polly-O Divestiture Assets, and subject to the approval by the United States in its sole discretion, assign, subcontract, or otherwise transfer any of the Polly-O Excluded Contracts to Acquirer of the Polly-O Divestiture Assets; *provided, however,* that for any contract or agreement that requires the consent of another party to assign, subcontract, or otherwise transfer, Defendants must use best efforts to accomplish the assignment, subcontracting, or transfer. Defendants must not interfere with any negotiations between Acquirer of the Polly-O Divestiture Assets and a contracting party.

L.      Defendants must use best efforts to assist Acquirer of the Polly-O Divestiture Assets to obtain all necessary licenses, registrations, and permits to operate the Polly-O Divestiture Business. Until Acquirer of the Polly-O Divestiture Assets obtains the necessary licenses, registrations, and permits, Defendants must provide Acquirer of the Polly-O Divestiture Assets with the benefit of Defendants' licenses, registrations, and permits to the full extent permissible by law.

M.      At the option of Acquirer of the Polly-O Divestiture Assets, and subject to approval by the United States in its sole discretion, on or before the date on which the Polly-O Divestiture Assets are divested, Defendants must enter into a supply contract or contracts for the production and packaging of Polly-O Products sufficient to meet the needs of Acquirer of the Polly-O Divestiture Assets, as determined by Acquirer of the Polly-O Divestiture Assets, for a period of up to 12 months, on terms and conditions reasonably related to market conditions for the production and packaging of Polly-O Products. Any amendment to or modification of any provision of any such supply contract is subject to approval by the United States, in its sole

discretion.  The United States, in its sole discretion,  may approve one or more extensions of any supply  contract, for a total of up to an additional  12 months.  If Acquirer of the Polly-O Divestiture  Assets seeks an extension of the term of any supply  contract, Defendants must notify the United States in writing  at least three months  prior to the date the supply  contract expires. Acquirer of the Polly-O  Divestiture Assets may terminate a supply  contract, or any portion  of a supply  contract, without cost or penalty at any time  upon commercially  reasonable written notice.  The employees of Defendants tasked with providing  services pursuant to a supply contract must not share any competitively  sensitive  information  of Acquirer of the Polly-O Divestiture  Assets with any other employee of Defendants.

N.      At the option of Acquirer of the Polly-O  Divestiture  Assets, and subject  to approval by the United States in its sole discretion,  on or before the date on which the Polly-O Divestiture  Assets are divested,  Defendants must enter into a contract to provide  transition services for back office, human resources, accounting, information  technology  services and support, facilitating  repacking,  warehousing, transportation,  and by making  personnel available to assist Acquirer of the Polly-O  Divestiture  Assets for a period  of up to six months  on terms and conditions  reasonably related to market conditions  for the provision  of the transition  services. Any amendment to or modification  of any provision  of a contract to provide  transition  services is subject to approval by the United States, in its sole discretion.  The United States, in its sole discretion,  may approve one or more extensions of any contract for transition  services, for a total of up to an additional  six months.  If Acquirer of the Polly-O  Divestiture  Assets seeks an extension of the term of any contract for transition  services, Defendants must notify  the United States in writing  at least 30 days prior to the date the contract expires.  Acquirer of the Polly-O Divestiture  Assets may terminate a contract for transition  services, or any portion  of a contract

for transition services, without cost or penalty at any time upon commercially reasonable written notice. The employees of Defendants tasked with providing transition services must not share any competitively sensitive information of Acquirer of the Polly-O Divestiture Assets with any other employee of Defendants.

O.       If any term of an agreement between Defendants and Acquirer of the Polly-O Divestiture Assets, including an agreement to effectuate the divestiture of the Polly-O Divestiture Assets required by this Final Judgment, varies from a term of this Final Judgment, to the extent that Defendants cannot fully comply with both, this Final Judgment determines Defendants' obligations.

## VI.    APPOINTMENT OF DIVESTITURE TRUSTEE

A.       If Defendants have not divested all of the Divestiture Assets within the periods specified in Paragraphs IV.A and V.A, Defendants must immediately notify the United States of that fact in writing. Upon application of the United States, which Defendants may not oppose, the Court will appoint a divestiture trustee selected by the United States and approved by the Court to effect the divestiture of any of the Divestiture Assets that have not been sold during the time periods specified in Paragraphs IV.A and V.A.

B.       After the appointment of a divestiture trustee by the Court, only the divestiture trustee will have the right to sell those Divestiture Assets that the divestiture trustee has been appointed to sell. The divestiture trustee will have the power and authority to accomplish the divestiture(s) to an Acquirer(s) acceptable to the United States, in its sole discretion, at a price and on terms obtainable through reasonable effort by the divestiture trustee, subject to the provisions of Sections IV, V, VI, and VII of this Final Judgment, and will have other powers as

the Court deems appropriate.  The divestiture trustee must sell the relevant Divestiture Assets as quickly as possible.

      C.     Defendants may not object to a sale by the divestiture trustee on any ground other than malfeasance by the divestiture trustee.  Objections by Defendants must be conveyed in writing to the United States and the divestiture trustee within 10 calendar days after the divestiture trustee has provided the notice of proposed divestiture required by Section VII.

      D.     The divestiture trustee will serve at the cost and expense of Defendants pursuant to a written agreement, on terms and conditions, including confidentiality requirements and conflict of interest certifications, approved by the United States in its sole discretion.

      E.     The divestiture trustee may hire at the cost and expense of Defendants any agents or consultants, including investment bankers, attorneys, and accountants, that are reasonably necessary in the divestiture trustee's judgment to assist with the divestiture trustee's duties. These agents or consultants will be accountable solely to the divestiture trustee and will serve on terms and conditions, including confidentiality requirements and conflict-of-interest certifications, approved by the United States in its sole discretion.

      F.     The compensation of the divestiture trustee and agents or consultants hired by the divestiture trustee must be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement that provides the divestiture trustee with incentives based on the price and terms of the divestiture and the speed with which it is accomplished.  If the divestiture trustee and Defendants are unable to reach agreement on the divestiture trustee's compensation or other terms and conditions of engagement within 14 calendar days of the appointment of the divestiture trustee by the Court, the United States, in its sole discretion, may take appropriate action, including by making a recommendation to the Court.  Within three business days of

hiring an agent or consultant, the divestiture trustee must provide written notice of the hiring and rate of compensation to Defendants and the United States.

G.     The divestiture trustee must account for all monies derived from the sale of the Divestiture Assets sold by the divestiture trustee and all costs and expenses incurred. Within 30 calendar days of the date on which any divestiture overseen by the divestiture trustee is completed, the divestiture trustee must submit that accounting to the Court for approval. After approval by the Court of the divestiture trustee's accounting, including fees for unpaid services and those of agents or consultants hired by the divestiture trustee, all remaining money must be paid to Defendants and the trust will then be terminated.

H.     Defendants must use best efforts to assist the divestiture trustee to accomplish the required divestiture(s). Subject to reasonable protection for trade secrets, other confidential research, development, or commercial information, or any applicable privileges, Defendants must provide the divestiture trustee and agents or consultants retained by the divestiture trustee with full and complete access to all personnel, books, records, and facilities of the relevant Divestiture Assets. Defendants also must provide or develop financial and other information relevant to the Divestiture Assets that the divestiture trustee may reasonably request. Defendants must not take any action to interfere with or to impede the divestiture trustee's accomplishment of the divestiture(s).

I.     The divestiture trustee must maintain complete records of all efforts made to sell any of the Divestiture Assets that have not been sold during the time periods specified in Paragraphs IV.A and V.A, including by filing monthly reports with the United States setting forth the divestiture trustee's efforts to accomplish the divestiture(s) ordered by this Final Judgment. The reports must include the name, address, and telephone number of each person

29

who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring any interest in the Divestiture Assets that the divestiture trustee has been appointed to sell and must describe in detail each contact.

J.      If the divestiture trustee has not accomplished the divestiture(s) ordered by this Final Judgment within six months of appointment, the divestiture trustee must promptly provide the United States with a report setting forth: (1) the divestiture trustee's efforts to accomplish the required divestiture(s); (2) the reasons, in the divestiture trustee's judgment, why the required divestiture(s) has not been accomplished; and (3) the divestiture trustee's recommendations for completing the divestiture(s). Following receipt of that report, the United States may make additional recommendations to the Court. The Court thereafter may enter such orders as it deems appropriate to carry out the purpose of this Final Judgment, which may include extending the trust and the term of the divestiture trustee's appointment by a period requested by the United States.

K.      The divestiture trustee will serve until divestiture of all Divestiture Assets is completed or for a term otherwise ordered by the Court.

L.      If the United States determines that the divestiture trustee is not acting diligently or in a reasonably cost-effective manner, the United States may recommend that the Court appoint a substitute divestiture trustee.

## VII.   NOTICE OF PROPOSED DIVESTITURE

A.      Within two business days following execution of a definitive agreement to sell the Athenos Divestiture Assets to an Acquirer other than Emmi Roth or execution of a definitive agreement to sell the Polly-O Divestiture Assets to an Acquirer other than BelGioioso,

Defendants or the divestiture trustee, whichever is then responsible for effecting the divestiture, must notify the United States of the proposed divestiture. If the divestiture trustee is responsible for completing the divestiture, the divestiture trustee also must notify Defendants. The notice must set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the relevant Divestiture Assets.

B.      Within 15 calendar days of receipt by the United States of a notice required by Paragraph VII.A, the United States may request from Defendants, the proposed Acquirer, other third parties, or the divestiture trustee additional information concerning the proposed divestiture, the proposed Acquirer, and other prospective Acquirers. Defendants and the divestiture trustee must furnish the additional information requested within 15 calendar days of the receipt of the request unless the United States provides written agreement to a different period.

C.      Within 45 calendar days after receipt of a notice required by Paragraph VII.A or within 20 calendar days after the United States has been provided the additional information requested pursuant to Paragraph VII.B, whichever is later, the United States will provide written notice to Defendants and any divestiture trustee that states whether the United States, in its sole discretion, objects to the proposed Acquirer or any other aspect of the proposed divestiture. Without written notice that the United States does not object, a divestiture may not be consummated. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to Defendants' limited right to object to the sale under Paragraph VI.C of this Final Judgment. Upon objection by Defendants pursuant to Paragraph

VI.C, a divestiture by the divestiture trustee may not be consummated unless approved by the Court.

D.     No information or documents obtained pursuant to this Section may be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party, including grand jury proceedings, for the purpose of evaluating a proposed Acquirer or securing compliance with this Final Judgment, or as otherwise required by law.

E.     In the event of a request by a third party for disclosure of information under the Freedom of Information Act, 5 U.S.C. § 552, the United States Department of Justice's Antitrust Division will act in accordance with that statute, and the Department of Justice regulations at 28 C.F.R. part 16, including the provision on confidential commercial information, at 28 C.F.R. § 16.7. Persons submitting information to the Antitrust Division should designate the confidential commercial information portions of all applicable documents and information under 28 C.F.R. § 16.7. Designations of confidentiality expire 10 years after submission, "unless the submitter requests and provides justification for a longer designation period." *See* 28 C.F.R. § 16.7(b).

F.     If at the time that a person furnishes information or documents to the United States pursuant to this Section, that person represents and identifies in writing information or documents for which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and marks each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," the United States must give that person 10 calendar days' notice before divulging the material in any legal proceeding (other than a grand jury proceeding).

## VIII.   FINANCING

Defendants may not finance all or any part of any Acquirer's purchase of all or part of the Divestiture Assets.

## IX.   ASSET PRESERVATION AND HOLD SEPARATE

Defendants must take all steps necessary to comply with the Asset Preservation and Hold Separate Stipulation and Order entered by the Court.

## X.   AFFIDAVITS

A.     Within 20 calendar days of the filing of the Complaint in this matter, and every 30 calendar days thereafter until the divestitures required by this Final Judgment have been completed, each Defendant must deliver to the United States an affidavit, signed by (a) on behalf of Kraft Heinz, the Global Chief Financial Officer, and the Global General Counsel, and (b) on behalf of Lactalis, the Chief Financial Officer of LAG Holding, and the Chief Legal Officer of LAG Holding, describing in reasonable detail the fact and manner of that Defendant's compliance with this Final Judgment. The United States, in its sole discretion, may approve different signatories for the affidavits.

B.     In the event Defendants are attempting to divest the Athenos Divestiture Assets to an Acquirer other than Emmi Roth or the Polly-O Divestiture Assets to an Acquirer other than BelGioioso, each affidavit required by Paragraph X.A must include: (1) the name, address, and telephone number of each person who, during the preceding 30 calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, an interest in the Divestiture Assets and describe in detail each contact with such persons during that period; (2) a description of the efforts Defendants have taken to solicit buyers for and complete the sale of the Divestiture Assets and to provide

required information to prospective Acquirers; and (3) a description of any limitations placed by Defendants on information provided to prospective Acquirers. Objection by the United States to information provided by Defendants to prospective Acquirers must be made within 14 calendar days of receipt of the affidavit, except that the United States may object at any time if the information set forth in the affidavit is not true or complete.

C.    Defendants must keep all records of any efforts made to divest the Athenos Divestiture Assets until one year after the Athenos Divestiture Assets are divested. Defendants must keep all records of any efforts made to divest the Polly-O Divestiture Assets until one year after the Polly-O Divestiture Assets are divested.

D.    Within 20 calendar days of the filing of the Complaint in this matter, each Defendant must deliver to the United States an affidavit signed by (a) on behalf of Kraft Heinz, the Global Chief Financial Officer, and the Global General Counsel, and (b) on behalf of Lactalis, the Chief Financial Officer of LAG Holding, and the Chief Legal Officer of LAG Holding, that describes in reasonable detail all actions that Defendant has taken and all steps that Defendant has implemented on an ongoing basis to comply with Section IX of this Final Judgment. The United States, in its sole discretion, may approve different signatories for the affidavits.

E.    If a Defendant makes any changes to actions and steps described in affidavits provided pursuant to Paragraph X.D, the Defendant must, within 15 calendar days after any change is implemented, deliver to the United States an affidavit describing those changes.

F.    Defendants must keep all records of any efforts made to comply with Section IX until the later of one year after the Athenos Divestiture Assets are divested or one year after the Polly-O Divestiture Assets are divested.

## XI.   COMPLIANCE INSPECTION

A.   For the purposes of determining or securing compliance with this Final Judgment or of related orders such as the Asset Preservation and Hold Separate Stipulation and Order or of determining whether this Final Judgment should be modified or vacated, upon written request of an authorized representative of the Assistant Attorney General for the Antitrust Division, and reasonable notice to Defendants, Defendants must permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by the United States:

1.   to have access during Defendants' office hours to inspect and copy, or at the option of the United States, to require Defendants to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants relating to any matters contained in this Final Judgment; and

2.   to interview, either informally or on the record, Defendants' officers, employees, or agents, who may have their individual counsel present, relating to any matters contained in this Final Judgment. The interviews must be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B.   Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division, Defendants must submit written reports or respond to written interrogatories, under oath if requested, relating to any matters contained in this Final Judgment.

C.   No information or documents obtained pursuant to this Section may be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States

is a party, including grand jury proceedings, for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.       In the event of a request by a third party for disclosure of information under the Freedom of Information Act, 5 U.S.C. § 552, the Antitrust Division will act in accordance with that statute, and the Department of Justice regulations at 28 C.F.R. part 16, including the provision on confidential commercial information, at 28 C.F.R. § 16.7. Defendants submitting information to the Antitrust Division should designate the confidential commercial information portions of all applicable documents and information under 28 C.F.R. § 16.7. Designations of confidentiality expire 10 years after submission, "unless the submitter requests and provides justification for a longer designation period." *See* 28 C.F.R. § 16.7(b).

E.       If at the time that Defendants furnish information or documents to the United States pursuant to this Section, Defendants represent and identify in writing information or documents for which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," the United States must give Defendants 10 calendar days' notice before divulging the material in any legal proceeding (other than a grand jury proceeding).

## XII.   NOTIFICATION

A.       Unless a transaction is otherwise subject to the reporting and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, 15 U.S.C. § 18a (the "HSR Act"), Lactalis may not, without first providing at least 30 calendar days advance notification to the United States, directly or indirectly acquire any assets of or any interest, including a financial, security, loan, equity, or management interest, in an entity

36

involved in the sale of ricotta cheese to retailers in the United States during the term of this Final Judgment.

B.     Lactalis must provide the notification required by this Section in the same format as, and in accordance with the instructions relating to, the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations, as amended, except that the information requested in Items 5 through 8 of the instructions must be provided only about the sale of ricotta cheese to retailers in the United States.

C.     Notification must be provided at least 30 calendar days before acquiring any assets or interest and must include, beyond the information required by the instructions, the names of the principal representatives who negotiated the transaction on behalf of each party, and all management or strategic plans discussing the proposed transaction. If, within the 30 calendar days following notification, representatives of the United States make a written request for additional information, Defendants may not consummate the proposed transaction until 30 calendar days after submitting all requested information.

D.     Early termination of the waiting periods set forth in this Section may be requested and, where appropriate, granted in the same manner as is applicable under the requirements and provisions of the HSR Act and rules promulgated thereunder. This Section must be broadly construed, and any ambiguity or uncertainty relating to whether to file a notice under this Section must be resolved in favor of filing notice.

## XIII.   NO REACQUISITION

Defendants may not reacquire any part of or any interest in the Divestiture Assets during the term of this Final Judgment without prior authorization of the United States.

## XIV.   RETENTION OF JURISDICTION

The Court retains jurisdiction to enable any party to this Final Judgment to apply to the Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XV.   ENFORCEMENT OF FINAL JUDGMENT

A.   The United States retains and reserves all rights to enforce the provisions of this Final Judgment, including the right to seek an order of contempt from the Court. Defendants agree that in a civil contempt action, a motion to show cause, or a similar action brought by the United States relating to an alleged violation of this Final Judgment, the United States may establish a violation of this Final Judgment and the appropriateness of a remedy therefor by a preponderance of the evidence, and Defendants waive any argument that a different standard of proof should apply.

B.   This Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore the competition the United States alleges was harmed by the challenged conduct. Defendants agree that they may be held in contempt of, and that the Court may enforce, any provision of this Final Judgment that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face. In any such interpretation, the terms of this Final Judgment should not be construed against either party as the drafter.

C.   In an enforcement proceeding in which the Court finds that Defendants have violated this Final Judgment, the United States may apply to the Court for an extension of this

Final Judgment, together with other relief that may be appropriate.  In connection with a successful effort by the United States to enforce this Final Judgment against a Defendant, whether litigated or resolved before litigation, that Defendant agrees to reimburse the United States for the fees and expenses of its attorneys, as well as all other costs including experts' fees, incurred in connection with that effort to enforce this Final Judgment, including in the investigation of the potential violation.

D.      For a period of four years following the expiration of this Final Judgment, if the United States has evidence that a Defendant violated this Final Judgment before it expired, the United States may file an action against that Defendant in this Court requesting that the Court order: (1) Defendant to comply with the terms of this Final Judgment for an additional term of at least four years following the filing of the enforcement action; (2) all appropriate contempt remedies; (3) additional relief needed to ensure the Defendant complies with the terms of this Final Judgment; and (4) fees or expenses as called for by this Section.

## XVI.   EXPIRATION OF FINAL JUDGMENT

Unless the Court grants an extension, this Final Judgment will expire 10 years from the date of its entry, except that after five years from the date of its entry, this Final Judgment may be terminated upon notice by the United States to the Court and Defendants that the divestitures have been completed and continuation of this Final Judgment is no longer necessary or in the public interest.

## XVII.  PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including by making available to the public copies of this Final Judgment and the Competitive Impact Statement,

public comments thereon, and any response to comments by the United States. Based upon the record before the Court, which includes the Competitive Impact Statement and, if applicable, any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date: March 15, 2022

United States District Judge